# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dennis Bloom,                   :
           Petitioner        :
                             :   No. 1539 C.D. 2017
       v.                     :
                             :   Argued: June 4, 2018
Pennsylvania State Ethics Commission, :
           Respondent     :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH[1]                         FILED: December 9, 2019

       Dennis Bloom (Petitioner) petitions for review of the September 27, 2017 order of the Pennsylvania State Ethics Commission (Commission) finding that Petitioner violated sections 1103(a) and 1105(b)(5), (8), and (9) of the Public Official and Employee Ethics Act (Ethics Act), 65 Pa.C.S. §§1103(a), 1105(b)(5), (8)-(9), regarding recommendations he made to the Pocono Mountain Charter School (PMCS) Board of Trustees (hereinafter PMCS Board or Board) and by filing deficient Statements of Financial Interests (SFIs) for the calendar years 2007, 2008, 2009, and 2010. Upon review, we affirm in part and reverse in part.

---

[1] This matter was reassigned to the author on August 16, 2018.

**Facts and Procedural History**

The following facts are garnered from the Commission's Final Adjudication dated September 27, 2017 (Adjudication).

In late 2002, Petitioner formed and incorporated the Pocono Mountain Learning Academy (PMLA) as a non-profit charter school with Petitioner as the sole incorporator. Petitioner filed a charter school application with the Pocono Mountain School District (the District) requesting that PMLA be granted status as a charter school within the District. The application identified the address of PMLA as 16 Carriage Square, Tobyhanna, Pennsylvania, the same address as Shawnee Tabernacle Church, which was founded by Petitioner in 1995 and for which he served as Pastor.[2] The application also identified the founding coalition of PMLA as consisting of Petitioner; Gricel Bloom, Petitioner's wife; James L. Shelton, a church elder; and Dr. Janet S. Shelton, Elder Shelton's wife.[3] The District approved the application and granted PMLA a charter on February 19, 2003.[4] On March 6, 2003, Petitioner filed amended articles of incorporation with the Pennsylvania Department of State reflecting a change in the entity name from the PMLA to the PMCS. Shortly thereafter, on March 21, 2003, Elder Shelton signed the charter on behalf of PMCS. (Adjudication at 4-6.)

---

[2] PMLA leased space from the church for its operations.

[3] Prior to opening PMLA, Petitioner founded and operated a private school known as Tobyhanna Christian Academy (TCA) from 1999 to 2002. Elder Shelton served as administrator of TCA and Dr. Shelton served as its principal.

[4] As a result of receiving a charter, PMLA became eligible for federal, state, and local funding. PMLA's revenues resulted primarily from reimbursements that it received from the District based on enrollment numbers.

The charter school application submitted to the District stated that the school's Board would consist of five members appointed by the school's founding coalition, with two seats being reserved for representatives of the parents/guardians of enrolled students. Elder Shelton served as the first president of the PMCS Board. The record is not clear as to the names of the other original PMCS Board members. Nevertheless, at its first meeting on May 30, 2003, the PMCS Board hired Petitioner to serve as PMCS's Chief Executive Officer (CEO). The PMCS Board further hired Petitioner's wife as Assistant CEO and Dr. Shelton as PMCS principal.[5] As CEO, Petitioner was a non-voting member of PMCS's Board of Trustees. (Adjudication at 5, 61.)

Petitioner acted as PMCS CEO from 2003 through December 10, 2010. Although a non-voting PMCS Board member, the CEO position required Petitioner to make recommendations to the Board regarding PMCS's operations. More specifically, as CEO, Petitioner was responsible for managing PMCS's contracts, including leases and employment contracts. As part of these latter duties, Petitioner was responsible to make personnel recommendations to the PMCS Board with respect to employee hiring and PMCS executive/administrator salaries and raises. (Adjudication at 6, 60.)

Sometime between March 2, 2006, and June 1, 2006, Petitioner, in his capacity as PMCS CEO, submitted an undated memorandum to the PMCS Board with recommendations for raises that would cover the last three-year period for which there were no raises, for himself, the Assistant CEO of PMCS who was his wife, and John Severs, then-principal of PMCS. (Adjudication at 17.)[6]

---

[5] Elder Shelton was the original president of the PMCS Board.

[6] During the Commission's April 26, 2017 hearing, Severs testified that he prepared this memorandum and forwarded the same to Petitioner requesting "a salary raise and contract" if he was

3

While Petitioner's job duties as CEO included the management of payroll and employment contracts, Petitioner did not participate in any Board discussion regarding whether to give the raises, nor did he vote on the salary increases. (Adjudication at 32.)[7] After at least two additional meetings and much discussion, which included review of comparative salaries of similar positions in other school districts, the voting members of the PMCS Board approved the recommended salary increases and Mrs. Bloom's base salary increased from $60,000.00 to $69,457.50. (Adjudication at 32-33.) The Commission concluded that this raise resulted in Mrs. Bloom receiving increased compensation totaling $28,372.50 prior to her resignation in 2009. (Adjudication at 64.)

Petitioner's daughter, Priscilla Bloom, had been working at PMCS since June 2006, and his son, Mitchell Bloom, had been working at PMCS since October 2006. Severs, and then-human resources director Naomi Laura, both testified that it was Severs who had initially recommended that Priscilla and Mitchell be hired by PMCS and that the Board would later ratify their employment. (R.R. at 852a-53a, 908a-09a.) Specifically, the Board approved the retroactive part-time employment of Priscilla and Mitchell Bloom at a meeting on November 1, 2006, and later approved the new hire of Mitchell Bloom as a technology assistant at a meeting on June 6, 2007. Petitioner did not participate in any deliberations or vote on either of these

"going to stay" at the school. (Reproduced Record (R.R.) at 849a, 872a.) Severs stated that he also included a request for a salary raise for Mrs. Bloom in this memorandum because he "needed her to do a number of variety of things, and she was available when [Petitioner] wasn't." (R.R. at 849a.) Severs explained that he "did the memo and . . . handed that to Mrs. Bloom because [Petitioner] wasn't there. That's why it's not an [sic] initialed." (R.R. at 850a.)

[7] There is testimony in the record from Michelle Thomas-Dezonie, president of the Board at the time the raises were approved, that Petitioner was asked to leave the room after presenting his memo and he complied.

4

recommendations. In his answer to the Commission's investigative complaint, Petitioner stated that he had recommended the hiring of his children.[8] Priscilla Bloom ultimately received wages totaling $18,039.60, and Mitchell Bloom received wages totaling $9,108.13. (Adjudication at 18-20.)

As to the matter of the SFIs, per section 1105 of the Ethics Act, 65 Pa.C.S. §1105, Petitioner was required to disclose all direct/indirect sources of income, his office, directorship, or employment in any business for profit, and his financial interest in any legal entity in business for profit. Since December 2006, Petitioner had been the sole owner and CEO of Radium, Inc. (Radium), a general contractor that was paid over $260,000.00 for subcontracting work performed during a 2007 PMCS building expansion project. Petitioner did not disclose any ownership interest, office, directorship, or employment with Radium on the 2007, 2008, 2009, or 2010 SFIs that the Ethics Act required Petitioner to file as a public official. (Adjudication at 9, 24, 36.)

On January 4, 2011, the Investigative Division of the Commission (Investigative Division) initiated a preliminary investigation into this matter after receiving a sworn complaint alleging that Petitioner violated sections 1103(a) and 1105(b) of the Ethics Act by using the authority of his public position to **secure** financial benefit for his immediate family and by failing to properly disclose his business and financial interests on SFIs filed for the 2007, 2008, 2009, and 2010 calendar years. Thereafter, by letter dated March 2, 2011, the Investigative Division informed Petitioner it was commencing a full investigation and outlined the nature of the violations Petitioner was alleged to have committed. (Adjudication at 57.)

---

[8] As will be discussed in further detail below, this admission by Petitioner constituted a binding, judicial admission.

5

On February 7, 2012, the Investigative Division sent Petitioner a letter informing him of amendments to the allegations previously contained in the March 2, 2011 letter, namely that Petitioner filed defective SFIs. Approximately three weeks later, on February 24, 2012, the Investigative Division mailed Petitioner the Investigative Complaint/Findings Report. Petitioner filed a timely Answer to Investigative Complaint/Findings Report (Answer) that included a demand for hearing. The Commission conducted a three-day evidentiary hearing on April 24-26, 2017. (Adjudication at 1, 57; R.R. at 161a-1022a.)

On September 27, 2017, the Commission issued its Adjudication and Order No. 1722 (Order), finding that Petitioner (1) violated section 1103(a) of the Ethics Act by recommending that the PMCS Board increase his wife's salary and hire his children, and (2) violated section 1105(b)(5), (8), and (9) of the Ethics Act by filing deficient SFIs for the calendar years 2007, 2008, 2009, and 2010. The Order further required Petitioner to pay $55,520.23, the aggregate amount received by his immediate family as a result of his alleged improper use of office. This appeal followed.[9]

Petitioner raises the following issues on appeal to this Court:

A. Whether the Commission properly relied on the judicial admissions doctrine in reaching its decision?

---

[9] This Court's review of a final adjudication of the Commission determines whether constitutional rights have been violated, whether an error of law was committed, or whether the findings of the Commission are supported by substantial evidence. 2 Pa.C.S. §704. Additionally, "[a]fter the facts are found to be supported by substantial evidence, this Court must then consider whether all the facts found by the Commission are 'clear and convincing proof' that the public official violated the Ethics Act." *Kraines v. State Ethics Commission*, 805 A.2d 677, 680 (Pa. Cmwlth. 2002). "Clear and convincing proof is evidence that is so clear, direct, weighty, and convincing that it enables the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts at issue." *G.L. v. State Ethics Commission*, 17 A.3d 445, 453 (Pa. Cmwlth. 2011).

6

B. Whether the Commission erred as a matter of law and abused its discretion in determining that the Petitioner violated Section 1103(a) of the Ethics Act[] in conjunction with the Board of Trustees of the Pocono Mountain Charter School granting a raise to the Petitioner's wife, the Assistant Chief Executive Officer?

C. Whether the Commission erred as a matter of law and abused its discretion in determining that the Petitioner violated Section 1103(a) of the Ethics Act in conjunction with the hiring of his two children?

D. Whether the Commission abused its discretion in determining that the Petitioner violated Section 1105(b) of the Ethics Act by filing deficient statements of financial interest for the years 2007, 2008, 2009 and 2010?

(Petitioner's Brief at 5.)

## Discussion

### Reliance by Commission on Judicial Admissions

Initially, Petitioner claims that the Commission erred and abused its discretion by applying the Judicial Admissions Doctrine to admissions contained in the Answer filed in this matter. *See* Petitioner's Brief at 15-19. Petitioner argues that by holding a hearing and allowing testimony on the issues, the Commission, through its hearing officer, allowed Petitioner to withdraw the admissions contained in the Answer. *Id.* We disagree.

As this Court has noted:

[W]hen the term admission is used without any qualifying adjective the customary meaning is an evidentiary admission, that is, words in oral or written form or conduct of a party or a representative offered in evidence against the party. Evidentiary admissions are to be distinguished from judicial admissions. Judicial admissions are not evidence at all. Rather, they are formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the

7

effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, the judicial admission, unless allowed by the court to be withdrawn, is conclusive in the case, whereas the evidentiary admission is not conclusive but is always subject to contradiction or explanation.

Judicial admissions may arise from a party's statement in its pleadings . . . [or] a party's failure to respond as required by the pleading rules . . . . An attorney's admission during the course of a trial is treated as a judicial admission. A party's statements in its brief or oral argument to the trial court are treated as a judicial admission.

[J]udicial admissions are conclusive. A party may not offer evidence to contradict the judicially admitted facts . . . .

*Bartholomew v. State Ethics Commission*, 795 A.2d 1073, 1078 (Pa. Cmwlth. 2002) (quoting L. Packel and A. Poulin, Pennsylvania Evidence §127, at 30–31 (2d ed. 1999)) (determining statements in an answer to an investigative complaint from the Commission are judicial admissions that are binding on parties and preclude the Commission from making contrary findings of fact in a final adjudication). Otherwise stated,

A judicial admission is an express waiver made in court or preparatory to trial by a party or his attorney, conceding for the purposes of trial, the truth of the admission, and may be contained in pleadings, stipulations and other like documents. . . . An important facet of such an admission is that it has been made for the advantage of the admitting party and once the admission has been made, the party making it is not allowed to introduce evidence attempting to disprove it.

*Lower Mount Bethel Twp. v. N. River Co.*, *LLC*, 41 A.3d 156, 162 (Pa. Cmwlth. 2012) (internal quotation marks omitted).

The statements contained in Petitioner's Answer are express statements made in preparation for trial by Petitioner or his attorney that concede certain truths. As a result, these statements must be construed as judicial admissions. *See Lower*

8

*Mount Bethel*; *Bartholomew*. By making those statements/admissions in pleadings or like documents, Petitioner conceded the truth of the matters contained therein. *Lower Mount Bethel*; *Bartholomew*. Petitioner cites no authority for the suggestion that the process afforded him by the hearing officer in allowing testimony somehow negated the judicial admissions contained in the Answer, which Petitioner never amended or requested be withdrawn. Accordingly, the Commission did not err by relying on the admissions contained in Petitioner's Answer in drafting the Adjudication.[10] But our analysis does not end here.

Petitioner claims that since he only made a recommendation which was pursuant to his duties as CEO and did not otherwise vote or attempt to influence the Board, the Commission erred by concluding that his submission of an undated memo to the PMCS Board recommending a salary increase for the Assistant CEO, his wife (made simultaneously with his recommendation for a raise for himself and then-principal, John Severs), as well as a subsequent recommendation to retroactively formalize the part-time hire of his children at PMCS, amounted to conflicts of interest in violation of section 1103 of the Ethics Act. *See* Petitioner's Brief at 19-30.

Section 1103(a) of the Ethics Act specifically provides that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. §1103(a). Section 1102 of the Ethics Act defines a "conflict of interest," in relevant part, as follows:

> "Conflict" or "conflict of interest." Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his

---

[10] This question is somewhat academic, however, as the reasons behind our resolution of the substantive claims of the instant appeal, discussed *infra*, apply regardless of whether this Court views the statements contained in Petitioner's Answer as judicial admissions.

immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. §1102. "The Commission bears the burden of proving a violation of the Ethics Act." *G.L.*, 17 A.3d at 453. To prove a violation of section 1103, the Commission must prove by clear and convincing evidence that there was a conflict of interest such that, (1) a public official/public employee, (2) used the authority of his/her office, (3) to acquire a private pecuniary benefit. *Id.*

Further, section 1102 of the Ethics Act defines the term "public official" as follows:

> Any person elected by the public or elected or appointed by a governmental body or an appointed official in the executive, legislative or judicial branch of this Commonwealth or any political subdivision thereof, provided that **it shall not include members of advisory boards that have no authority to expend public funds** other than reimbursement for personal expense or to otherwise exercise the power of the State or any political subdivision thereof.

65 Pa.C.S. §1102 (emphasis added). Additionally, Pennsylvania's Charter School Law[11] defines a person who serves as an administrator of a charter school as a public official for purposes of the Ethics Act. *See* Section 1715-A(12) of the Charter School Law, 24 P.S. §17-1715-A(12).[12] The Charter School Law expressly includes chief

---

[11] Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, 24 P.S. §17-1701-A – 17-1751-A.

[12] Section 1715-A(12) of the Charter School Law provides, in pertinent part:

> A person who serves as an administrator for a charter school shall not receive compensation from another charter school or from a company that provides management or other services to another charter school. The term "administrator" shall include the chief executive officer of a charter school and all other employes of a charter school who by virtue of their positions exercise management or operational oversight

executive officers in the definition of "administrator." *Id.* Hence, Petitioner's status as a public official falls within the ambit of the Ethics Act. Indeed, no party challenges the Commission's determination that, as the CEO of a charter school in a public school district, Petitioner was a public official. Accordingly, this element requires no further discussion.

## Conflict of Interest

We next turn to the question of whether Petitioner's recommendation to the PMCS Board that it increase the salary of the Assistant CEO, his wife, constituted a conflict of interest under the Ethics Act.[13]

_____

responsibilities. A person who serves as an administrator for a charter school shall be a public official under 65 Pa.C.S. Ch. 11 (relating to ethics standards and financial disclosure). A violation of this clause shall constitute a violation of 65 Pa.C.S. §1103(a) (relating to restricted activities), and the violator shall be subject to the penalties imposed under the jurisdiction of the State Ethics Commission.

24 P.S. §17-1715-A(12).

[13] We note that Petitioner argues that the salary increase for his wife as Assistant CEO "was not financial gain other than compensation provided by law." (Petitioner's brief at 13.) In making this argument, Petitioner appears to be referencing a prior version of the Ethics Act which prohibited a public official from using his office "to obtain financial gain other than compensation provided by law for himself, a member of his immediate family, or a business with which he is associated." *Formerly* Section 3(a) of the Ethics Act, Act of October 4, 1978, P.L. 883, repealed by the Act of October 15, 1998, P.L. 729, *formerly* 65 P.S. §403(a). This language has since been replaced in section 1103(a) of the Ethics Act, such that a public official is precluded from using his office "for the private pecuniary benefit" of himself or an immediate family member. 65 Pa.C.S. §1103(a). While Petitioner correctly notes that the "other than compensation provided by law" language remains in section 1101.1(a) of the Ethics Act (declaring that "public office is a public trust and that any effort to realize personal financial gain through public office other than compensation provided by law is a

To constitute a conflict of interest in violation of section 1103(a) of the Ethics Act, the Board must prove that a public official used the authority of his or her office for private pecuniary benefit. *Kistler v. State Ethics Commission*, 22 A.3d 223, 227 (Pa. 2011). In *Kistler*, our Supreme Court specifically noted that "[t]here is no explicit intent element" in either section 1103(a) of the Ethics Act or the definition of "conflict of interest" found in section 1102. *Id.* The court in *Kistler* observed that the Ethics Act does not define "use,"[14] reviewed the common meanings associated with this term, and concluded that, under the Ethics Act, it must be construed as "**an action directed toward a purpose**." *Id.* (emphasis added). The court stressed that such an interpretation was "strengthened" by the declared purpose of the Ethics Act, found in section 1101.1(a), which states, in pertinent part, "The Legislature hereby declares that public office is a public trust and that **any effort** to realize personal financial gain through public office other than compensation provided by law is a violation of that trust. . . ." 65 Pa.C.S. §1101.1(a) (emphasis added).[15] The court explained:

> The dictionary definition of the noun "use" is "the act of using or putting to a purpose, *e.g.,* the use of a car;" analogously, the definition of the verb "use" is "1. to bring or put into service or action: employ, *e.g.,* use a pen or use your imagination, or 2. to put to some purpose: avail oneself of, *e.g.,* use the bus to get to work." Webster's II New College Dictionary, Houghton Mifflin Co., 1995, at 1215. Thus, the common and approved usage of the word "use,"

---

violation of that trust"), 65 Pa.C.S. §1101.1, we cannot overlook the express language of section 1103 relating directly to a conflict of interest.

[14] Likewise, the Ethics Act does not define the term "private pecuniary benefit." However, the legal meaning of "pecuniary benefit" is "[a] benefit capable of monetary valuation." Black's Law Dictionary 167 (8th ed. 2004). Further, our Superior Court has referred to "private pecuniary benefit" as "financially related personal gain." *Commonwealth v. Habay*, 934 A.2d 732, 738 (Pa. Super. 2007).

[15] Section 1101.1 of the Ethics Act was added by the Act of October 15, 1998, P.L. 729.

which must guide our inquiry, indicates an action directed toward a purpose. Accordingly, to violate [S]ubsection 1103(a), a public official must act in such a way as to put his office to the purpose of obtaining for himself a private pecuniary benefit. Such directed action implies awareness on the part of the public official of the potential pecuniary benefit as well as the motivation to obtain that benefit for himself.

That the General Assembly intended such an interpretation of [S]ubsection 1103(a) is strengthened by a declaration in the Ethics Act's purpose provision: "The Legislature hereby declares that public office is a public trust and that *any effort* to realize personal financial gain through public office other than compensation provided by law is a violation of that trust." 65 Pa.C.S. § 1101.1(a) Purpose (emphasis added). The dictionary defines "effort" as "exertion of physical or mental energy to do something." Webster's II New College Dictionary at 360. In other words, *an effort is an activity directed toward a goal. Accordingly, pursuant to the Ethics Act, violation of the public trust arises from activity directed toward the goal of realizing personal financial gain through public office.* This is entirely consistent with the understanding of the word "use" in the context of the statutory definition of "conflict of interest" set forth above.

*Kistler*, 22 A.3d at 227-28 (brackets omitted) (emphasis added). *See also Kraines v. State Ethics Commission*, 805 A.2d 677, 681 (Pa. Cmwlth. 2002) (noting that "use" of public office requires action by a public official that in some way facilitates his receipt of the pecuniary gain); *Sivick v. State Ethics Commission*, 202 A.3d 814, 823 (Pa. Cmwlth. 2019), appeal granted in part, (Pa., No. 118 MAL 2019, filed August 6, 2019) (holding that "[u]se of authority of office is more than the mere mechanics of voting and encompasses all of the tasks needed to perform the functions of a given position.

13

Use of authority includes . . . discussing, conferring with others, and lobbying for a particular result.").[16]  The court in *Kistler* went on to hold as follows:

> [W]e now hold that to violate the conflict of interest provision in subsection 1103(a) of the Ethics Act, a public official **must be consciously aware of a private pecuniary benefit for himself, his family, or his business, and then must take action in the form of one or more specific steps to attain that benefit.** As informed by the Commonwealth Court decisions . . . this interpretation derives from the plain meaning of the statutory definition of conflict of interest, which requires that a public official use the authority of his office for private pecuniary benefit.

*Kistler*, 22 A.3d at 231 (emphasis added).

In the present case, there is no dispute that Petitioner submitted a memorandum to the PMCS Board which included, *inter alia*, a request for a raise for his wife.  (Adjudication at 17; Finding of Fact No. 75.)  Specifically, Petitioner requested that his wife's salary be increased "from $60,000.00 to $69,457.50 minimum due to that she was overlooked for the last three years regarding increases and at 5% minimum for each year missed $69,457.50 would bring her up to at least a bare minimum raise."[17]  *Id.*  The PMCS Board approved the raise for Petitioner's wife in

---

[16] In *Sivick*, we held that a township board chairman's one-on-one discussions with the other supervisors regarding the hiring of his son and essentially directing them to vote to remove the nepotism policy from the employee handbook, constituted use of the authority of his office to obtain a private pecuniary benefit, and, consequently, a conflict of interest in violation of section 3(a) of the Ethics Act.  We noted in *Sivick* that "[b]ecause [the chairman] acknowledge[d] evidence of his conscious awareness of a private pecuniary gain, this Court must consider whether Sivick [took] action in the form of one or more specific steps to attain that benefit."  202 A.3d at 822.

[17] The memorandum submitted by Petitioner was addressed "To: The Board of PMCS", "From: CEO", regarding "Raises of personnel" and stated as follows:

> I hereby recommend the following raises to be considered and executed for the coming fiscal budget year of July 1, 2006.

2006 and she continued at the salary until her resignation in 2009, accumulating an additional $28,372.50 during that time period. (Adjudication at 18, Findings of Fact Nos. 77, 79.)

While Petitioner argues that the PMCS Board acted independently in approving the raise for his wife, and that he did not vote on her raise or otherwise attempt to influence the decision of the PMCS Board, the Commission concluded that Petitioner "used the authority of his public position as CEO of PMCS when . . . he submitted an undated memo to the PMCS Board" requesting a raise for his wife. (Adjudication at 70.) The Commission found that when Petitioner presented this memo to the PMCS Board, he advised that he and his wife "had worked for a few years without a raise" and that the request represented a "bare minimum raise due to [Petitioner's wife] having been overlooked for the prior three years." *Id.* The Commission also found that Petitioner admitted that the PMCS Board approved the raise based on his recommendation. (Adjudication at 63.) The Commission concluded that the raise that Petitioner's wife received, from $60,000.00 to $69,457.50, as specifically requested by Petitioner in the memo, constituted a "resulting private pecuniary benefit." (Adjudication at 70.)

---

Mrs. Bloom to be brought up from $60,000.00 to $69,457.50 minimum due to [sic] that she was overlooked for the last three years regarding increases and that at [a] 5% minimum for each year missed $69,457.50 would bring her up to at least a bare minimum raise.

. . .

I ask the Board to consider these raises and confirm at least the bare minimum. Any back pay not received because of the overlooking is up to the Board to approve payment.

(Adjudication at 17; Finding of Fact No. 75).

15

Although Petitioner stressed that his job duties as CEO required him to make personnel decisions, including recommending salaries, the Commission noted these job duties also permitted Petitioner to "[d]elegate responsibility and authority to carry out [organization management] programs to subordinates" and to delegate communication regarding "actions of the Board relating to personnel matters." (Adjudication at 12; Finding of Fact No. 60.) Although the Commission did not specifically address whether Petitioner could have avoided making a request for a salary increase for his wife given his delegation powers and Severs testimony that he was the person that drafted the memorandum, the Commission based its decision on Petitioner's action and admission that the PMCS Board approved the raise based on his recommendation, which resulted in a private pecuniary benefit.

Based upon the Commission's findings, and in light of the holding of *Kistler* that a public official must be aware of a private pecuniary benefit for himself, his family or his business, and then must take action in the form of one or more specific steps to attain that benefit, the Commission did not err in concluding that Petitioner's actions constituted a use of his office for a private pecuniary benefit in violation of section 1103 of the Ethics Act.

The dissent contends Dennis Bloom did not use an "actual power provided by law," *i.e.*, "the authority of his office," by asking the board of directors of the Pocono Mountain Charter School to raise the compensation of school employees because neither the Charter School Law nor the Nonprofit Corporation Law of 1988[18] empowered Bloom to grant himself or any school employee a raise. Rather, the applicable statutes vested this power exclusively in the board of directors. We disagree.

The Ethics Act defines "authority of office or employment" as:

---

[18] 15 Pa.C.S. §§5101-6162.

16

The actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public employment.

65 Pa.C.S § 1102.

Part of Petitioner's duties and responsibilities as CEO included making recommendations for staff salaries. The memorandum Petitioner submitted to the other members of the Board of Trustees recommending his wife's raise was submitted in his official capacity as CEO. However, the dissent suggests this was not an action within the "authority of office" because the defining phrase "an actual power provided by law" requires a *power provided by law,* not a mere duty.

The dissent's narrow construction of the "authority of office" would improperly serve to eliminate a plethora of public officials and public employees, acting within their job descriptions, from the requirements of the conflict of interest provisions of the Ethics Act, by virtue of the absence of an express description in the law of their duties.

The dissent overlooks that the responsibility of the CEO to operate the school is, in fact, provided by law. Specifically, the Public School Code of 1949[19] provides that "[t]he board of trustees of a charter school shall have the authority to decide matters related to the operation of the school . . . ." 24 P.S. § 17-1716-A(a).

As CEO of the subject charter school, Petitioner was a nonvoting member of the PMCS Board of Trustees; Answer at 12, ¶ 31b. Notably, the charter school application submitted by Petitioner[20] to the Pocono Mountain School District states

---

[19]  Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§1-101 – 27-2702.

[20] Petitioner was among the "Founding Coalition" of the charter school. Answer at 12, ¶ 30(c). The charter school application submitted by Petitioner noted that: "[t]he initial members of the Board

17

that the "Board [] will assume the ultimate responsibility for the governance of the [PMCS]" and the "Chief Administrative Officer (CAO)[21] will report directly to the Board [] and assume the overall responsibility for the daily operation of the charter school." Answer at 12, ¶ 31a. The Board delegated to the CEO[22] the power to control the daily operations of the school, including the management of employment contracts. *Id*.; Answer at 13, ¶ 34. This power of the CEO is directly derived from the Board's "actual power provided by law." *See* Pa.C.S. § 1102. The power to handle the daily operations of the school is "necessary to the performance" of the CEO's duty to manage employment contracts, which includes recommending salaries and salary increases/raises and is, therefore, within the "authority of office" of the CEO as defined by the Ethics Act. *See id.* Here, Petitioner's job description, as CEO, enumerated the power to delegate responsibility and authority to carry out organizational management programs to subordinates and the power to delegate communication regarding "actions of the Board relating to personnel matters[.]" (Finding of Fact No. 60.)

---

of Trustees will be appointed by the Founding Coalition." *Id.* at 12, ¶ 31(b). Petitioner was among the initial trustees. *Id.*

[21] Within the application to the school district, the title Chief Administrative Officer is used instead of Chief Executive Officer; however, it is apparent from the record that the CEO was, in fact, the chief administrative officer of the PMCS. *See* Answer at 12, ¶ 31. There is no position at PMCS titled CAO; however, there is a CEO, Petitioner, and an Assistant CEO, Mrs. Bloom. Petitioner was PMCS's chief administrative officer. *See* Answer at 7, ¶ 14.

[22] Also, notably, the law governing charter school requirements specifically identifies the chief executive officer as an "administrator" of the school subject to the Ethics Act and identifies the CEO as among those who, "by virtue of their positions exercise management or operation oversight responsibilities." *See* Section 1715-A(12) of the Charter School Law, Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1715-A(12).

We now address the Commission's determination that Petitioner violated section 1103 when he made a recommendation to the Board that it formally hire his children on a part-time basis.

The Ethic Act's definition of "income" under section 1102 expressly excludes "miscellaneous, incidental income of minor dependent children." 65 Pa.C.S. §1102.[23] While Petitioner, relying on *Dodaro v. State Ethics Commission*, 594 A.2d 652 (Pa. 1991), argued before the Commission that said exclusion applied herein such that the hiring of his children and their receipt of wages could not constitute a conflict of interest violation, the Commission rejected this argument. The Commission first stated that *Dodaro* was inapplicable because it was decided under a prior version of the Ethics Act that utilized an obsolete standard, *i.e.*, an exclusion from the financial gain that a public official was prohibited from receiving for compensation paid as "provided by law." The Commission noted that Petitioner's children received a combined income over a three-year period in excess of $27,000.00. Additionally, the Commission noted

---

[23] "Income" is defined, in full, as,

> Any money or thing of value received or to be received as a claim on future services or in recognition of services rendered in the past, whether in the form of a payment, fee, salary, expense, allowance, forbearance, forgiveness, interest, dividend, royalty, rent, capital gain, reward, severance payment, proceeds from the sale of a financial interest in a corporation, professional corporation, partnership or other entity resulting from termination or withdrawal therefrom upon assumption of public office or employment or any other form of recompense or any combination thereof. The term refers to gross income and includes prize winnings and tax-exempt income. The term **does not include** gifts, governmentally mandated payments or benefits, retirement, pension or annuity payments funded totally by contributions of the public official or employee, or **miscellaneous, incidental income of minor dependent children**.

65 Pa.C.S. §1102 (emphasis added).

19

that the "income" defined under section 1102 related solely to the reporting of income on an SFI, and not to an alleged conflict of interest violation. The Commission cited *Snyder*, wherein we noted that *Dodaro* was decided under an earlier version of the Ethics Act and not under the private pecuniary gain standard that remains prohibited under section 1103(a) of the Ethics Act. *Snyder*, 686 A.2d at 853 n.16.

In *Dodaro*, our Supreme Court reversed this Court's decision that affirmed an order of the Commission finding Frank Dodaro to be in violation of former section 3(a) of the Ethics Act (relating to a conflict of interest) and directing him to make restitution of nearly $5,000.00 for wages received by his minor son for summer employment with a city water authority. Dodaro was a member of the board of directors of his city water authority and participated in voting to hire high school students for summer employment, including his minor son. In the case *sub judice*, while the Commission is correct that *Dodaro* was decided under the prior version of the Ethics Act and held that the wages received by the minor son did not constitute financial gain other than compensation provided by law, a standard that is now obsolete, our Supreme Court in that case recognized that "[a]lthough the subsequent amendments to the Ethics Act in 1989 are not controlling for purposes of this appeal, we note that the Legislature redefined 'income' to exclude miscellaneous, incidental income of minor dependent children." *Dodaro*, 594 A.2d at 655 n.3.

The Commission's rejection of Petitioner's *Dodaro* argument in this case based on the contention that the "income" defined under section 1102 related solely to the reporting of income on an SFI appears misplaced in light of the Supreme Court's aforementioned recognition in *Dodaro*, a case that involved a conflict of interest violation. Moreover, nothing in the Ethics Act reflects the Commission's purported interpretation of the definition of "income." To the contrary, as the Commission recognized in a footnote in its Final Adjudication, disclosing sources of income of

20

immediate family members on SFI forms was required under the original version of the Ethics Act, but was later found to be unconstitutional. (Final Adjudication at 72 n.1; R.R. at 1127a.) The fact that later versions of the Ethics Act continue to utilize the exclusion for "miscellaneous, incidental income of minor dependent children" from the definition of income certainly suggests that the General Assembly did not view this exclusion as relating solely to SFIs.

Further, the Ethic Act's definition of "conflict of interest" under section 1102 expressly excludes,

> an action . . . which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. §1102. While PMCS had no formal hiring process at the time of Petitioner's children's hiring, PMCS was in the practice of hiring students for part-time work and, further, other children did work at the school.[24] (R.R. at 435a.) Pursuant to this practice, the Board approved the children's retroactive hiring. (R.R. at 376a-77a, 431a-36a.) No evidence indicated that Petitioner's children were hired via a process unique to them, that they had different duties, or that they received benefits of any kind over and above what other students working at the school received. Under the facts of this case, Petitioner's children were part of a subclass of part-time PMCS employees and were hired and treated as such. Hence, the children's hiring is excluded from the Ethics Act's definition of "conflict of interest." 65 Pa.C.S. §1102.

Moreover, we applied this exception in *Kraines*, which is factually similar to this case. In *Kraines*, we reversed the order of the Commission concluding that

---

[24] In fact, the Board President's child also worked part-time at PMCS. (R.R. at 435a.)

21

Judith Kraines, who was elected as county controller in Berks County in 1996, violated section 1103(a) of the Ethics Act by obtaining a private pecuniary benefit for her husband, a forensic pathologist who performed autopsies for the county coroner. Kraines' husband, Dr. Neil A. Hoffman, and other pathologists from the local hospital had been performing autopsies for the county since 1979. The county and Dr. Hoffman later entered into an exclusive retainer contract in 1989, which paid him an annual fee for certain services and established a fee schedule for other services, including autopsies. In 1995, at the request of Dr. Hoffman, the county coroner approved an increase in the fee schedule, without amending the retainer contract and without the approval of the county commissioners. In 1998, two years after Kraines' election as county controller, Dr. Hoffman again requested and was granted an increase in the fee schedule by the county coroner. Kraines' office issued checks to the pathologists based on this increased fee schedule. The Commission thereafter initiated its investigation and ultimately issued a final adjudication concluding that Kraines was in violation of the Ethics Act by participating in the approval process of payments to her husband of pathology fees in excess of the 1989 contract and fee schedule.

This Court reversed, noting that Kraines did not "use" her public office for receipt by her husband of improper pecuniary benefits to which he was not entitled. Rather, we indicated that Dr. Hoffman had been performing autopsies for the county years before his wife was elected, Kraines had no involvement in the coroner's decision to utilize her husband's services, and Kraines had no involvement in the amount her husband and other pathologists were paid. With respect to the section 1103(a) exception, we stated that Dr. Hoffman was part of a subclass in relation to work performed and payments received from the county, that he received the same payments as other pathologists in this subclass, even in light of his specific retainer contract, and that the record was devoid of any preferential treatment Dr. Hoffman received.

22

In the present case, Petitioner's children, who at the time were enrolled students in PMCS, had been working at PMCS for several months before they were officially hired. When this issue was brought to the Board's attention by the human resources department, the Board approved their hiring retroactively. Although Petitioner recommended that his children be formally hired,[25] there is no evidence that he participated in any Board discussions relative to their hiring and/or their salaries. The hiring of students was normal and part of a school policy; indeed, the daughter of the Board President was also a student hire at PMCS. In other words, it was the school policy, not Petitioner's use of his office, that led to the employment of Petitioner's children. Petitioner did not participate in the hiring; rather, the principal of PMCS handled the hiring along with the human resources department, with the ultimate decision resting with the Board. Further, there was no evidence that Petitioner's children received preferential treatment or a salary not commensurate with the salary of other children hired by PMCS.

Thus, no clear and convincing evidence exists to establish that Petitioner's suggestions that the Board hire his children actually constituted a step in the realization of their employment at PMCS. Once again, the ultimate hiring decision rested with the Board. Therefore, the evidence does not demonstrate, for purposes of a conflict of interest violation under section 1103(a) of the Ethics Act, that Petitioner "used" the authority of his office to realize his children's employment and attendant private pecuniary gain.

---

[25] Petitioner contends that there was no evidence that he was involved in the hiring of his children. However, the Board found in its Adjudication that Petitioner recommended the same, relying on the minutes from a June 6, 2007 Board meeting (Adjudication at 18; R.R. at 1073a), as well as his admission to the same in his Answer to the Investigative Division's Complaint/Findings Report, (R.R. at 87a).

23

## Statements of Financial Interests

Lastly, Petitioner argues that the Commission erred by finding that he violated section 1105(b) of the Ethics Act by filing deficient SFIs. *See* Petitioner's Brief at 36-39. We disagree.

The Ethics Act requires that public officials file annual SFIs. *See* 65 Pa.C.S. §1105. In pertinent part, section 1105 requires the following information:

> **Required information.--**The statement shall include the following information for the prior calendar year with regard to the person required to file the statement:
>
> . . .
>
> (5) The name and address of any direct or indirect source of income totaling in the aggregate $1,300 or more. However, this provision shall not be construed to require the divulgence of confidential information protected by statute or existing professional codes of ethics or common law privileges.
>
> . . .
>
> (8) **Any office, directorship or employment of any nature whatsoever in any business entity.**
>
> (9) Any financial interest in any legal entity engaged in business for profit.

65 Pa.C.S. §1105(b)(5), (8)-(9) (emphasis added).[26]

---

[26] The Ethics Act further provides the following relevant definitions:

> "Business." Any corporation, partnership, sole proprietorship, firm, enterprise, franchise, association, organization, self-employed

Here, Petitioner's filed SFIs were admitted into evidence at the hearing. The SFIs, among other shortcomings, did not disclose Petitioner's position with or ownership interest in Radium, of which Petitioner was the sole owner and which received over $260,000.00 in fees related to PMCS's 2007 building expansion project.

---

individual, holding company, joint stock company, receivership, trust or any legal entity organized for profit.

"Business with which he is associated." Any business in which the person or a member of the person's immediate family is a director, officer, owner, employee or has a financial interest.

. . .

"Financial interest." Any financial interest in a legal entity engaged in business for profit which comprises more than 5% of the equity of the business or more than 5% of the assets of the economic interest in indebtedness.

. . .

"Income." Any money or thing of value received or to be received as a claim on future services or in recognition of services rendered in the past, whether in the form of a payment, fee, salary, expense, allowance, forbearance, forgiveness, interest, dividend, royalty, rent, capital gain, reward, severance payment, proceeds from the sale of a financial interest in a corporation, professional corporation, partnership or other entity resulting from termination or withdrawal therefrom upon assumption of public office or employment or any other form of recompense or any combination thereof. The term refers to gross income and includes prize winnings and tax-exempt income. The term does not include gifts, governmentally mandated payments or benefits, retirement, pension or annuity payments funded totally by contributions of the public official or employee, or miscellaneous, incidental income of minor dependent children.

65 Pa.C.S. §1102.

The Commission detailed the deficiencies of Petitioner's SFIs at length in the body of

the Adjudication and then summarized the deficiencies as follows:

> The SFI forms on file with the PMCS for [Petitioner] for calendar years 2007, 2008, 2009, and 2010 were deficient.
>
> ID-33 is an SFI of [Petitioner] that purports to be for calendar year 2008 that is dated 1/5/2007. This SFI is deficient in blocks 3, 4, 5, 13, and 14. Block 13 did not list Radium, Inc. as a business with which [Petitioner] had an office, directorship, or employment. Blocks 3, 4, and 5 were not completed. This SFI bears a date that is inconsistent with the calendar year for which it purports to be filed.
>
> [Petitioner's] SFI for calendar year 2007, which is in evidence as ID-34 is deficient in blocks 5, 8, 9, 10, 11, 12, 13, 14, and 15. Block 13 did not list Radium, Inc. as a business with which [Petitioner] had an office, directorship, or employment. Blocks 5, 8, 9, 10, 11, 12, 13, 14, and 15 were not completed.
>
> [Petitioner's] SFI in evidence as ID-35, which purports to be for calendar year 200[8], is deficient in blocks 5 and 13. Block 13 did not list Radium, Inc. as a business with which [Petitioner] had an office, directorship, or employment. Block 5 was not completed. Mr. Caruso[27] testified he believes Block 14, pertaining to "Financial Interest in [A]ny Legal Entity in Business for Profit," is also deficient. This SFI bears a date that is inconsistent with the calendar year for which the form purports to be filed.
>
> [Petitioner's] SFI for calendar year 2009, which is in evidence as ID-36, is deficient in block 13. Block 13 is marked "none" and does not list Radium, Inc. as a business with which [Petitioner] had an officer, directorship, or employment. Mr. Caruso testified that he believes Radium, Inc. should have been disclosed in Block 14, pertaining to "Financial Interest in [A]ny Legal Entity in Business for Profit," as well.

---

[27] Referring to Robert Caruso, the Commission's Executive Director.

[Petitioner's] SFI for calendar year 2010, which is in evidence as ID-37, is deficient in block 13. Block 13 did not list Radium, Inc. as a business with which [Petitioner] had an office, directorship, or employment.

The Ethics Act has its own definition of the term "income" that is used for purposes of filing SFIs pursuant to the Ethics Act. 65 Pa.C.S. §1102.

The SFI forms that are in evidence as ID-34 and ID-37 do not list <u>any</u> sources of income. However, W-2 wage and tax statements on file with the PMCS detail the following annual wages paid to [Petitioner] for tax/calendar years 2007 through 2010: (1) 2007: $147,472.26; (2) 2008: $143,230.70; (3) 2009: $137,213.40; and (4) 2010: $146,828.45.

[Petitioner] received income from the TCA of $12,117.90 in 2007. TCA is listed as a source of income on ID-33 but not ID-34.

In 2007 and 2008, [Petitioner] received monthly rental payments in the amount of $1,800.00 from Donald and Tarrence Lynch; however, [Petitioner] failed to disclose a source of income as to such payments.

On his SFIs filed for the 2007 and 2008 calendar years, [Petitioner] did not list Radium, Inc. as a source of income. [Petitioner] avers that he did not receive income in excess of $1,300 from Radium. Inc. (<u>Answer</u>, at 26, paragraph 73; <u>see</u> Fact Finding 50) and to support this claim, Mrs. Bloom testified that the joint tax returns [Petitioner] and Mrs. Bloom filed for the years 2007 and 2008 do not reflect any income from Radium, Inc.

(Adjudication at 68-69.)

Further, Petitioner's filings concede that he filed deficient SFIs. *See* Answer at 3; *see also* Petitioner's Memorandum of Law Filed on Behalf of Respondent Dennis Bloom at 34 ("It is clear, even from the most precursory review of these statements, that they were in deplorable condition with glaring discrepancies . . . .").

These admissions and the SFIs themselves provide clear and convincing evidence that Petitioner violated section 1105(b) by filing insufficient SFIs.

Petitioner's argument that the Commission failed to provide him warning notices regarding the SFIs' deficiencies pursuant to section 1107(5) of the Ethics Act[28] is belied by the Amended Notices of Investigation the Commission sent to Petitioner on February 7, 2012, and February 10, 2012. *See* Adjudication at 69-70.[29]

---

[28] Section 1107, Powers and duties of commission, provides in pertinent part:

> In addition to other powers and duties prescribed by law, the commission shall:
>
> . . .
>
> (5) Inspect [SFIs] which have been filed in order to ascertain whether any reporting person has failed to file such a statement or has filed a deficient statement. If, upon inspection, it is determined that a reporting person has failed to file a [SFI] or that any statement which has been filed fails to conform with the requirements of section 1105 (relating to [SFIs]), then the commission shall in writing notify the person. Such notice shall state in detail the deficiency and the penalties for failure to file or for filing a deficient [SFI].

65 Pa.C.S. §1107(5).

[29] As the Commission explained:

> The letters/Amended Notices of Investigation dated February 7, 2012, and February 10, 2012, which are in evidence as ID-12 and ID-13, notified [Petitioner] of deficient filings of Statements of Financial Interests. Specifically, each letter/Amended Notice of Investigation notified [Petitioner] of the allegation that [Petitioner] violated Sections 1105(b)(5), (8), and (9) of the Ethics Act "when he failed to disclose on SFIs filed for the 2007, 2008, 2009 and 2010 calendar years all direct/indirect sources of income, his office, directorship or employment in any business for profit and financial interest in any legal entity in business for profit." ID-12, at 1, 3; ID-13, at 2-4.

(Adjudication at 69-70.)

28

Additionally, Petitioner's argument that the Commission did not provide adequate time to amend his SFIs is likewise unpersuasive. Between the Commission's February 2012 Amended Notices and September 2017 Adjudication, Petitioner never filed any amended SFIs.

The Commission did not err by determining that Petitioner violated section 1105(b) of the Ethics Act with regard to the SFIs he filed for calendar years 2007, 2008, 2009, and 2010. The Commission's determination is supported by substantial evidence that clearly and convincingly proves Ethics Act violations and is neither an error of law nor a violation of Petitioner's constitutional rights.

**Conclusion**

As to Petitioner's recommendations regarding his children, there is no clear and convincing evidence establishing that Petitioner's suggestions that the Board hire his children actually constituted a step in the realization of their employment at PMCS. Once again, the ultimate hiring decision rested with the Board. Therefore, the evidence does not demonstrate, for purposes of a conflict of interest violation under section 1103(a) of the Ethics Act, that Petitioner "used" the authority of his office to realize his children's employment and attendant private pecuniary gain. Accordingly, we reverse the Commission's September 27, 2017 order to the extent that it finds that Petitioner violated section 1103(a) of the Ethics Act in relation to the hiring of his children. However, because Petitioner's issuance of a memorandum to the Board of Trustees recommending a raise for his wife constituted a use of his office for a private pecuniary benefit under *Kistler*, the Commission did not err as a matter of law or abuse its discretion in concluding that such action by Petitioner resulted in a conflict of interest violation under section 1103(a). Further, the record supports the Commission's determination that Petitioner filed deficient SFIs for the calendar years 2007, 2008,

2009, and 2010. Accordingly, we affirm the order to the extent it finds that Petitioner violated section 1103(a) in relation to the request for a raise for his wife as well sections 1105(b)(5), (8), and (9) of the Ethics Act.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dennis Bloom,                                    :
                    Petitioner                   :
                                                 :    No. 1539 C.D. 2017
          v.                                     :
                                                 :
Pennsylvania State Ethics Commission,   :
                    Respondent                   :

## ***ORDER***

AND NOW, this 9th day of December, 2019, the order of the Pennsylvania State Ethics Commission, dated September 27, 2017, is REVERSED in part with respect to the finding that Dennis Bloom (Petitioner) violated section 1103(a) of the Public Official and Employee Ethics Act (Ethics Act), 65 Pa.C.S. §1103(a), in relation to the hiring of his children. The order is AFFIRMED in part with respect to the finding that Petitioner violated section 1103(a) of the Ethics Act in relation to the request for a raise for his wife as well as sections 1105(b)(5), (8), and (9), 65 Pa.C.S. §1105(b)(5), (8)-(9), in relation to the filing of deficient statements of financial interest for the calendar years 2007, 2008, 2009, and 2010.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dennis Bloom, : 
        Petitioner : 
  :   No. 1539 C.D. 2017
     v. :   Argued: June 4, 2018
  : 
Pennsylvania State Ethics : 
Commission, : 
        Respondent : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge

<u>OPINION NOT REPORTED</u>

CONCURRING AND DISSENTING OPINION
BY PRESIDENT JUDGE LEAVITT          FILED: December 9, 2019

At issue is whether Dennis Bloom used an "actual power provided by law," *i.e.*, "the authority of his office," by asking the board of directors of the Pocono Mountain Charter School to raise the compensation of school employees. Neither the Charter School Law[1] nor the Nonprofit Corporation Law of 1988[2] empowered Bloom to grant himself or any school employee a raise. Rather, the applicable statutes vested this power exclusively in the board of directors. Accordingly, I respectfully dissent from the majority's holding that Bloom used the authority of his office by asking the board of directors to raise the salary of the school's Assistant Chief Executive Officer, his wife, to $69,457.50 *per annum*.

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, 24 P.S. §§17-1701-A – 17-1751-A.

[2] 15 Pa. C.S. §§5101-6162.

The Public Official and Employee Ethics Act (Ethics Act) prohibits a public employee from engaging in "conduct that constitutes a conflict of interest." 65 Pa. C.S. §1103(a). A "conflict of interest" is defined as a public official's use of "the authority of his office or employment" for his private pecuniary benefit. 65 Pa. C.S. §1102. The Ethics Act defines "authority of office or employment" as the "actual power provided by law." 65 Pa. C.S. §1102. The appropriate inquiry, therefore, is what "actual" power was conferred upon Bloom "by law."

Pocono Mountain Charter School was organized as a nonprofit corporation and, thus, subject to the Nonprofit Corporation Law of 1988. This statute vests ultimate authority for governance of a nonprofit corporation in its board of directors. 15 Pa. C.S. §5721. Specifically, it gives the board of directors the power "[t]o elect or appoint and remove officers, employees and agents of the corporation, define their duties, [and] fix their reasonable compensation…." 15 Pa. C.S. §5502(a)(16). Similarly, Section 1724-A(a) of the Charter School Law vests the charter school's board of directors with the exclusive power to determine "the level of compensation and all terms and conditions of employment of staff[.]" 24 P.S. §17-1724-A(a).

As the Chief Executive Officer of Pocono Mountain Charter School, Bloom was responsible for the School's day-to-day operations, which included the responsibility to submit employee compensation requests to the board of directors.[3] Sometime between March 2006 and June 2006, Bloom submitted a written request

---

[3] The majority emphasizes that a charter school CEO is responsible for the operations of the charter school. However, this general authority is circumscribed by the specific provision in the Charter School Law that only the board of trustees can "determine the level of compensation and all terms and conditions of employment." 24 P.S. §17-1724-A(a). In statutory construction, the specific controls the general. Section 1933 of the Statutory Construction Act of 1972, 1 Pa. C.S. §1933.

MHL-2

to the board of directors for a pay raise for himself, his wife, and John Severs, who was the School's principal. As would be expected for any such request, Bloom offered several reasons in support of the request, including salary comparisons. Submitting this request to the board of directors with a recommendation was not an exercise of "actual power provided by law" because only the board of directors had the power to make compensation decisions.

Further, Bloom did not act in an untoward manner. He did not attend the board of directors' meeting on compensation and did not participate in the board's discussions. He did not, and could not, vote on compensation or on any matter that required a board vote because he was only an *ex officio* member. At all times, the board of directors had full control of employee compensation.

Unquestionably, the Ethics Act is a penal statute. It states that a public official who engages in a conflict of interest "commits a felony and shall, upon conviction, be sentenced to pay a fine of not more than $10,000 or to imprisonment for not more than five years, or both." 65 Pa. C.S. §1109(a). Section 1107(13) of the Ethics Act authorizes the State Ethics Commission to impose civil penalties and restitution. 65 Pa. C.S. §1107(13).[4] Penal provisions, whether in a civil or criminal statute, must be strictly construed. *Brown v. Bureau of Professional and Occupational Affairs*, 18 A.3d 1256, 1259 (Pa. Cmwlth. 2011) (citing 1 Pa. C.S. §1928). As we have explained:

> Ambiguities should and will be construed against the government. This principle has its foundation in the rule of lenity that provides that any ambiguity in a criminal statute will be construed in favor of the defendant. The rule of lenity requires a "clear and unequivocal warning in language that people

_____

[4] Bloom has been ordered to pay a civil penalty of $55,000 for making the instant compensation requests.

MHL-3

generally would understand, as to what actions would expose them to liability for penalties and what the penalties would be."

*Id.* (quoting *Commonwealth v. Reaser*, 851 A.2d 144, 149 (Pa. Super. 2004)). The rule of lenity "gives validity to our laws" by requiring a "clear and unequivocal warning" of what conduct creates liability. *McGrath v. Bureau of Professional and Occupational Affairs, State Board of Nursing*, 146 A.3d 310, 316 (Pa. Cmwlth. 2016).

Section 1103(a) of the Ethics Act is subject to the rule of lenity and must be strictly construed against the government. The statutory proscription against using "actual power provided by law" does not include asking a board of directors for a pay raise for oneself or for a family member employee. There needs to be a "clear and unequivocal warning" in the Ethics Act before such a "request" can be construed as the "use" of an "actual power provided by law."

I would reverse that portion of the State Ethics Commission's adjudication holding that Bloom violated Section 1103(a) of the Ethics Act by asking the board of directors for a raise for his wife. I would affirm those parts of the adjudication holding Bloom liable for not filing a financial statement.

_____
MARY HANNAH LEAVITT, President Judge